UNITED STATES BANKRUPTCY COURT
DISTRICT OF NORTH DAKOTA

In Re:                                              Bankruptcy No. 10-31334
                                                    Chapter 7
Lee T. Gunkelman and
Tracy M. Gunkelman,

                          Debtors.
_____/
Rapid Funding Group, Inc.,

                          Plaintiff,

          vs.                                       Adversary No. 11-07003

Lee T. Gunkelman,

                          Defendant.
_____/

## MEMORANDUM AND ORDER

**I.    INTRODUCTION**

Debtors Lee T. Gunkelman and Tracy M. Gunkelman petitioned for relief under
Chapter 7 of the Bankruptcy Code on October 28, 2010.  In January 2011, Plaintiff Rapid
Funding Group, Inc. (Rapid Funding) filed a Complaint, seeking a determination that
Debtors/Defendants' debt to Rapid Funding is excepted from discharge pursuant to 11
U.S.C. § 523(a)(2)(A).  Rapid Funding also pled causes of action under 11 U.S.C.
§ 727(a)(5) seeking a denial of discharge and under 28 U.S.C. § 2201 seeking a
declaration concerning the validity of Rapid Funding's claim against Debtors and its interest
in Debtors' real property located at 725 17th Street North, Fargo, North Dakota (Fargo
Property).  In addition, Rapid Funding claims it is entitled to specific performance requiring
Debtors to execute a deed of trust to the Fargo Property.

Debtors filed an Answer on February 28, 2011, admitting that Lee Gunkelman executed a promissory note in favor of Rapid Funding, but denying Debtors are liable for paying the note due to a lack of consideration, denying that a trust exists between Rapid Funding and Debtors, and denying that Rapid Funding holds a valid security interest in Debtors' property. Debtors also offered multiple affirmative defenses in their Answer.

Claiming to hold perfected mortgage liens superior to any lien or security interest claimed by Rapid Funding in the Fargo Property, Alerus Financial, N.A. and Starion Financial both filed motions to intervene pursuant to Federal Rule of Bankruptcy Procedure 7024. Prior to trial, Rapid Funding, Alerus, and Starion entered into a stipulation providing that Rapid Funding does not dispute that Alerus and Starion both recorded mortgages that are senior and prior to the interest Rapid Funding claims in Debtors' real property. Rapid Funding also agreed to amend its Complaint to remove any claim seeking to establish the priority of its interest as compared to any other security interest or lien against the property. Alerus and Starion agreed that after the Complaint was amended, their motions to intervene could be denied as moot. Rapid Funding filed an Amended Complaint consistent with their agreement. The Court approved the Stipulation to Amend Complaint and Deny Motions to Intervene and entered an order denying the motions to intervene without prejudice.

All other claims in the Amended Complaint filed April 12, 2011, remained virtually the same. Debtors filed an Answer to Amended Complaint on April 18, 2011, asserting the same defenses it pled in its first Answer.

At trial of this adversary case, Rapid Funding abandoned its claims against Debtor Tracy M. Gunkelman. Therefore, the Court entered an Order dismissing her as a party.

2

Consequently, the only causes of action before this Court are Rapid Funding's claims against Debtor Lee T. Gunkelman (Gunkelman) under section 523(a)(2)(A), asserting that his debt to Rapid Funding is nondischargeable because it was obtained by false pretenses, false representations, or actual fraud; its claim under section 727(a)(5), alleging that Gunkelman's discharge should be denied because he failed to satisfactorily explain the loss or deficiency of assets to meet his liabilities; its claim under section 2201, alleging it is entitled to a declaration that it has an existing, valid claim against Gunkelman based on the terms of the note he signed; and its claim that it is entitled to specific performance requiring Gunkelman to execute a new deed of trust to the Fargo Property.

## II.    FINDINGS OF FACT

Rapid Funding is a Nevada corporation based in Oregon. It describes itself as a private "hard money lender." Pl.'s Trial Br. 1. The loans it provides are short term, generally a year or less. Randy Rugg, the Chief Executive Officer and former President of Rapid Funding,[1] explained that the clients Rapid Funding serves are typically affluent people who need money immediately for projects or investments where the expected rate of return is significantly higher than the costs to borrow. Rapid Funding earns its profits through high fees and interest rates. It makes approximately 25 loans a year and seeks a 24-30% rate of return on its loans.

At all times relevant to the loan transaction at issue, Gunkelman was the owner and operator of FM Fence, a fence installation business in Fargo, North Dakota.

---

[1] Rugg testified that he has been working in the short-term loan making business since at least 2001. Initially, he worked for City Lending, which became Rapid Funding in 2005.

In late December 2006, Brett Regal approached Rapid Funding, seeking to secure a $200,000 short-term loan. Gunkelman testified that Regal's role was to help Gunkelman get a loan and that he knew Regal was acting on his behalf in his efforts to secure the loan. Gunkelman claimed that he needed a loan for FM Fence and planned to use the money to pay debt related to jobs for which he had not yet been paid. Conversely, Rugg suggested that Gunkelman and Regal were business partners and Regal was acting on behalf of the partnership in this loan transaction.[2] Rugg further suggested that the funds may have been used for an investment in African oil futures.

According to Rugg, his first contact with Regal was during a telephone conversation. Rugg stated that Lauren Huffe[3] and two mortgage brokers, who had previously introduced

---

[2] In support of its claim that Regal and Gunkelman were partners, Rapid Funding offered testimony from Rugg and Gunkelman about Gunkelman's business relationship with Regal. Gunkelman knew Regal since the early 1990s. Regal and Gunkelman's father had many business ventures together. It was Rugg's understanding that Regal worked with Gunkelman's father for approximately 14 years and was now working with Gunkelman. According to Gunkelman, his relationship with Regal consisted of Regal approaching him with ideas and Gunkelman trying to effectuate those ideas, but he denied these business transactions made them business partners. Gunkelman admitted, however, that Regal, Gunkelman and Steve Candor were partners in C, G & R Enterprises, which was formed on June 15, 2004. The partnership was formed to purchase a sugar beet plant in Texas, but the transaction fell through. Gunkelman maintains the partnership did not last long.
    Gunkelman also acknowledged that, seven months prior to December 2006 and the loan transaction at issue, he transferred ownership of the sugar beet seed used as collateral for the loan at issue to Regal's company so that Regal could sell the seed with the understanding that they would split the proceeds.
    With regard to the loan transaction at issue, Rugg testified that Regal was the point of contact on the loan negotiations and that Gunkelman confirmed this understanding during telephone conversations and by responding to requests Rapid Funding made to Regal.
    Regal was not called as a witness at trial.

[3] Rugg testified that he learned Huffe was the CFO of two companies, but did not offer any other background information about Huffe or the nature of her involvement

4

clients to Rapid Funding, were also present during this initial telephone conversation. Rugg stated that neither Regal nor Huffe had any prior dealings with Rapid Funding.

During the initial and subsequent conversations between Rugg and Regal, Rugg explained how Rapid Funding operates: substantial collateral (generally in the form of real estate) with a value of at least three or four times the loan principal must be provided to secure a loan. Regal informed Rugg that he did not own real estate that could be offered as collateral, but Rugg remembered Regal indicating that Gunkelman, his business partner, would offer the collateral. According to Rugg, he then had a telephone conversation with Gunkelman, Regal, and Huffe about collateral for the loan Regal requested. Gunkelman acknowledged he had telephone contact with Rugg, but denied Huffe's involvement in loan negotiations.

Rugg testified that Gunkelman initially offered the Fargo Property as collateral for the loan. At the time the loan was made, Rugg knew that there was a lien recorded against this property. In fact, he maintained that the deed of trust allegedly memorializing Gunkelman's pledge of this collateral was titled "Second" Deed of Trust because there was already a first lien against the property. The value of this real property was insufficient to adequately secure the loan since equity available was not three or four times the $200,000 loan. Therefore, Rugg required additional collateral, claiming the loan would not have been provided without it.

In response to his request for additional collateral, Gunkelman offered sugar beet seed as collateral for the loan. In a letter to Regal printed on Dakota Quality Seed

---

with the transaction. Gunkelman denied ever meeting Huffe or speaking to her on the telephone. Huffe was not called as a witness at trial.

letterhead, Gunkelman represented he possessed 229,280 pounds of sugar beet seed that had been in storage for only 11 months and that the current value of the seed was $8,135,880.00. Pl.'s Exh. 16.[4] He also provided germination test results with the value estimate.[5] On the date the letter was written and when it was provided to Rapid Funding, Dakota Quality Seed was no longer in existence–a fact which Gunkelman knew but did not relay to Rapid Funding. Gunkelman maintained he used the Dakota Quality Seed letterhead because Dakota Quality Seed still owned the seed.[6]

In contrast to his claim that Dakota Quality Seed owned the sugar beet seed, Gunkelman also stated that he assumed ownership of the seed 11 months before he offered it as collateral. Specifically, Gunkelman testified that the sugar beet seed, which he first saw in 1999, was originally owned by his father who passed away in 2003. After his father's passing, Gunkelman's mother took ownership of the sugar beet seed. He then inherited the seed from his mother. At the time Gunkelman signed the letter estimating the value of the seed to be over $8 million, Gunkelman maintained he owned the sugar beet seed for 11 months. Seven months before the loan transaction at issue, Gunkelman transferred the sugar beet seed to Regal's company to sell. Gunkelman admitted that he

---

[4] The December 22, 2006 letter marked as Plaintiff's Exhibit 16 is addressed to Regal, but Gunkelman requested a secretary at FM Fence to send them by facsimile to Rugg.

[5] Gunkelman found the germination test results in 1999 when he acquired the property where the seed was stored. Counsel for Rapid Funding invited Rugg to assume the seed was tested in 1999. Based on this assumption, Rugg testified that if he had known the test results were completed in 1999 during loan negotiations in December 2006, the information "would have changed the entire nature of the transaction."

[6] Gunkelman's father owned a seed company.

offered the sugar beet seed as collateral for the loan, but the evidence received at trial does not establish who owned the seed at the time he offered the collateral.

The basis for the value estimate Gunkelman included in the December 22, 2006 letter is more apparent.  Gunkelman multiplied the weight (in pounds) by $50.00, the market price for new sugar beet seed.  Gunkelman admitted, however, that the seed he offered as collateral was not new seed.  He also explained that Regal helped with the assessment and that he had spoken with other individuals in the seed industry to arrive at a value.  Gunkelman did not possess the expertise to personally value the sugar beet seed and testified he had no reason to believe the seed was not worth in excess of $8,000,000.

In his December 22, 2006 letter regarding the value of the sugar beet seed, Gunkelman also neglected to mention a sales restriction.  Pl.'s Exh. 16.  Gunkelman testified the sugar beet seed could not be sold within the United State due to a restriction existing on the seed since the time it was held by Gunkelman's father.  Gunkelman did not know whether Regal conveyed this information to Rapid Funding.

In contrast to Gunkelman's representations in his December 22, 2006, letter to Regal regarding the value of the sugar beet seed, Vernon Baenen testified that Gunkelman's sugar beet seed retained little value.  Baenen, a salesman and general manager who worked for Gunkelman at FM Fence until 2009, explained that the sugar beet seed was originally owned by Gunkelman's father and was stored in warehouses at FM Fence when he began his employment.  Although not positive, Baenen estimated that he began working at FM Fence in 2001 and, at that time, the sugar beet seed was exuding an odor.  Baenen also stated that the seed was infested with mice, necessitating removal from the warehouses because the value of storage was greater than the value of the sugar beet

7

seed. As a result, the sugar beet seed was loaded into vans, and the vans were parked at the rear of the FM Fence property. The sugar beet seed remained in the vans until sometime after Baenen stopped working for FM Fence in 2009.

Kari Radtke, a former employee of FM Fence, also testified about the value of the sugar beet seed.[7] She explained that the sugar beet seed was previously owned by Gunkelman's father and that it was her understanding the sugar beet seed had been in storage for a long time, had gotten wet and was worthless.

Radtke also testified that she was aware of Gunkelman's assessment of the value of the sugar beet seed. She witnessed Gunkelman's signature on the letter to Regal in which Gunkelman represented that the appraised value of the sugar beet seed was $8,135,880.00. See Pl.'s Exh. 16. She also sent the letter by facsimile to Rugg at Gunkelman's direction. Radtke testified that, although other office employees questioned the value of the sugar beet seed, Gunkelman believed the seed was worth quite a bit of money and planned to take it to North Dakota State University for testing to determine its value. She explained she held the conception that Gunkelman could take something of no value and get value out of it and she believed this to be applicable to the sugar beet seed.

Relying upon Gunkelman's assurances, Rapid Funding performed a minuscule amount of further investigation into the value of the sugar beet seed, only searching the internet for current values and finding a broad range: $3/lb to $80/lb. Rapid Funding

---

[7] Radtke began working for FM Fence in 2004 as a secretary. She was working as a secretary for Gunkelman in December 2006 when the loan negotiations at issue began. At some point in time, Radtke was promoted to office manager for FM Fence. Radtke was not employed by FM Fence at the time of trial.

performed neither an onsite inspection of the sugar beet seed nor sought a professional evaluation of germination quality.

On December 27, 2006, Gunkelman executed a promissory note (Note) in which he promised to pay Rapid Funding $200,000 plus interest and fees. Pl.'s Exh. 13. The terms of the Note provided that the principal amount of $200,000 plus a $35,000 origination fee were due on January 10, 2007, 14 days after the Note was signed. Id. at ¶¶ 1.3, 1.9. During the loan period, no interest would accumulate on the principal. Id. at ¶ 1.1. If a voluntary extension of the January 10, 2007 due date was granted, interest would be charged at 16% per annum. Id. at ¶ 1.1. If the Note was not paid by January 10, 2007 and a voluntary extension was not granted, then the Note went into default. Id. at ¶¶ 1.9, 2. Upon default, a monthly involuntary extension fee of 3% of the unpaid principal balance would become due on the first of every month after the first involuntary extension period expired, a default fee equal to 20% of the unpaid principal balance would be assessed, and the interest rate would double to 32%, which would be compounded monthly until the loan was paid in full. Id. at ¶¶ 1.14, 2.7, 3.4. The Note provided that it was executed under, and shall be construed and enforced in accordance with, the laws of the state of Oregon. Id. at ¶ 5.1.

Rugg explained that the template for the Note was a standard template used by Rapid Funding and that these terms are common in the private short-term lending industry. Gunkelman initialed each page and signed as a maker of the Note. Although the signature page appears to require a notary public to witness the signature, his signature was not notarized. Pl.'s Exh. 13. Rugg testified that Gunkelman expressed no concern over the Note's terms. Gunkelman acknowledged that he had been in business for a number of

years and understood the terms of the Note, but was not excited about them.[8]  He knew

finding funding elsewhere would be difficult.

Regal did not sign or initial any portion of the Note although a signature block was

provided for him to sign as an additional maker.  Pl.'s Exh. 13.  According to Rugg, Rapid

Funding believed Regal's signature on the Note was unnecessary because he was not an

owner of the pledged collateral.  Rugg explained the Note form was prepared prior to Rapid

Funding realizing that only Gunkelman would offer collateral.  After learning that Rugg

would not be offering collateral, Rapid Funding did not require Rugg to sign the Note, but

did not remove his name as a maker, explaining why the signature block remained on the

document.  Gunkelman did not sign a written document acknowledging his consent for

Regal to be excepted as a maker as required by paragraph 7.5.[9]

The Note also provided that the Fargo Property served as collateral for the Note.

Specifically, paragraph 6 of the Note, titled "Collateral" states, in pertinent part:

6.1   This Note is secured to the Collateral described in Exhibit A (Property
Description) and that security is memorialized in the Deed of Trust
issued by the Maker to the Holder as an express condition of this loan.
In the event of a conflict in terms of the Note and the Deed of Trust,
then the Deed of Trust shall prevail except where the Deed expressly
refers to the Note.

---

[8] During their testimony, Baenen and Radtke confirmed that Gunkelman had
been in business for a number of years prior to 2006.

[9] Paragraph 7.5 provides:
7.5   AMENDMENTS IN WRITING - This Promissory Note may not be
amended, modified or changed, nor shall any provision hereof be
deemed waived, except only by an instrument in writing signed by
the party against whom enforcement of an such waiver,
amendment, change, or modification is sought.
Pl.'s Exh. 13.

      6.2    Property address commonly known as: 725 17th Street N, Fargo, North Dakota, County of County.

Pl.'s Exh. 13, ¶ 6.  Exhibit A was not attached to the Note, and Rapid Funding failed to produce a signed deed of trust.  Rugg claims that Rapid Funding received a signed deed of trust for the Fargo Property from Gunkelman prior to fund disbursement, but it inadvertently lost the document.  Rapid Funding offered only an unsigned Second Deed of Trust as an exhibit.  Pl.'s Exh. 18.  Gunkelman initialed pages 2-18 of the Second Deed of Trust.  Id.

      Gunkelman disputes he ever sent a complete deed of trust to Rapid Funding.  Pl.'s Exh. 12.  He explained the deed of trust was not ultimately required by Rapid Funding because it was not needed as security.  Id.

      Although Rugg indicated in his testimony that the loan was granted based upon Gunkelman's representations regarding the value and age of the sugar beet seed and Gunkelman's pledge of the seed as security, the Note makes no mention of the sugar beet seed as collateral.  Prior to releasing the loan proceeds, Rapid Funding did not arrange for an onsite inspection of the sugar beet seed or request a sample to test for quality.  Rapid Funding did not obtain or record a security agreement or a UCC financing statement memorializing Gunkelman's agreement to pledge the seed as collateral for the loan.

      Gunkelman does not dispute Rapid Funding's claim that the sugar beet seed served as security for the loan.  In fact, he admitted that the loan evidenced by the Note was secured by the sugar beet seed.  See Pl.'s Exh. 12, p. 6.

      On or about December 28, 2006, Rapid Funding wired $200,000 to Huffe at the direction of Regal.  Rugg and Huffe corresponded about the transaction.  Def.'s Exh. 50.

11

Rugg testified the accounts to which the money was wired, although termed "the transactional account for Bret [Regal]", were for Regal and Gunkelman's business.  See Def.'s Exh. 50.  Gunkelman maintains he did not see the wire transmittal, did not know Regal arranged to transfer the loan proceeds to Huffe and did not grant permission for Huffe to receive the proceeds of the loan.  Gunkelman contends that Huffe was an unintended recipient of the funds, that the funds should have been provided to him, and only him, and that Regal did not have the authority to wire the funds to anyone but him.  Gunkelman testified that he did not learn that the loan proceeds went to a third party until mid- to late 2007.  After he learned that the loan proceeds were wired to Huffe, he did not ask Regal who she was or how Regal knew her.  He did not inquire about Huffe even when Rapid Funding began its attempts to collect on the Note.

According to Rugg, Gunkelman never made any indication the funds were to go specifically to him.  Instead, Rugg was convinced that Regal was the one in charge of determining where the funds would be sent and how they would be spent.

The parties do not dispute Regal's role with regard to the other aspects of the loan transaction.  Regal was Rapid Funding's main contact throughout loan negotiations.  Rugg testified that Gunkelman relayed to him that Regal was authorized to represent Gunkelman and Regal.  Rugg never had any doubt that Regal was authorized to speak for Gunkelman.

Gunkelman's testimony was similar to Rugg's in this regard.  Gunkelman admitted that he knew Regal was acting on his behalf during loan negotiations.  Gunkelman also acknowledged that Regal was acting on his behalf when he offered the sugar beet seed as collateral for this loan and when Regal relayed wire instructions for the transfer of the

12

loan proceeds.  Gunkelman clarified, however, that he never authorized Regal to relay wire instructions to Rapid Funding for the transfer of funds to Huffe.

The Note was not repaid by January 10, 2007, when it was due, and no payments have ever been made on the outstanding balance.  Rapid Funding considered the Note to be in default as of March 2007.

When it did not receive payment, Rapid Funding initially contacted Regal.  Rugg claims Regal was the only person contacted about the default because he had been identified as the point of contact on this loan.  Gunkelman testified that, after the loan was in default, Regal stated he would use proceeds from a business deal to pay down the debt arising from the Note.  Regal did not repay the loan.

Rapid Funding did not contact Gunkelman about the default until mid-2007.  Rugg and Eddie Dierickx, President of Rapid Funding, both communicated with Gunkelman about his debt on the Note, either in writing or by telephone.  Rugg estimated that he and Dierickx communicated with Gunkelman a half dozen times after the Note went into default.  Rugg and Dierickx both testified that from mid-2007 until the end of 2009, Gunkelman never gave any indication that the Note's funds were sent to the wrong person or that he was not liable on the Note.  Gunkelman admitted he never relayed to Rapid Funding that he believed he was not liable on the Note during this time.  Rather, Gunkelman worked with Rapid Funding on ways to repay the loan.

Rugg testified that he viewed liquidation of the seed to be the primary means of recovering the debt owed by Gunkelman.  One liquidation option included packaging the seed and selling it as feed stock to farmers.  Prior to pursuing this alternative, Rapid Funding requested an evaluation of the sugar beet seed to determine its gestational and

13

nutritional value.  Rapid Funding advised Gunkelman of this plan and sought a sample of the sugar beet seed and $50.00 from Gunkelman to perform the testing.  See Pl.'s Exh. 5. Gunkelman complied with both requests.  Gunkelman conceded that "he did attempt to use the seed to pay off the debt."[10]

The results of the test, which was conducted by Oregon State University, demonstrated the sugar beet seed had no redeeming value and was worthless.  Pl.'s Exhs. 5, 6.  Rugg stated Gunkelman did not dispute these results.  No commercially valuable use for the sugar beet seed was ever obtained.  Eventually, Gunkelman gave the sugar beet seed away with the trailers where the seeds was stored as an incentive to the recipient to remove the seed.

On or about September 24, 2008, Dierickx indicated to Regal and Gunkelman that the parties should move toward settlement based upon default of the Note.  See generally Pl.'s Exh. 7.  The parties did not reach a settlement.  Rapid Funding received a letter dated January 12, 2010, from Gunkelman's attorney stating he was not liable on the Note.  Rugg testified that this was the first time Gunkelman informed Rapid Funding he was not liable on the Note.  Gunkleman admitted that January 2010 was the first time he advised Rapid Funding that he was not liable for the debt.

According to the proof of claim filed by Rapid Funding and its trial brief, the outstanding balance of the debt to Rapid Funding on the Note totaled $2,401,928.10.  At trial, Rugg testified that, based upon simple calculations and no compounding, Gunkelman

---

[10]  At some point in time Regal and a representative of Rapid Funding had discussed liquidation of the sugar beet seed to pay the debt.  Gunkelman testified that Regal was acting on his behalf when Regal offered to use the sugar beet seed as payment toward the loan.

owed a minimum of $1,013,168 as of the date of trial.  Def.'s Exh. 51.  This sum is the debt

Rapid Funding is seeking to collect for breaching the terms of the Note. Rapid Funding also

requests a declaration that $1,013,168 is the sum of its claim.

Gunkelman denies that he is liable for payment of this sum because he did not

receive the loan proceeds.   In other words, Gunkelman claims that the Note is not

enforceable because it lacks consideration.

## II.   CONCLUSIONS OF LAW

### A.   Jurisdiction

The parties stipulated that this Court has jurisdiction over this adversary proceeding.

They also stipulated that this is a core proceeding under 28 U.S.C.

§ 157(b)(2)(A),(I), and (O).  Neither party disputes that this Court has authority to enter a

final order.  This Court finds that it has jurisdiction under 28 U.S.C. §§ 1334 and 157 and

that it has authority to enter a final order in these matters. The following opinion constitutes

findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy

Procedure 7052.

### B.   11 U.S.C. § 523(a)(2)(A)

The statutory exceptions to discharge in bankruptcy are narrowly construed against

the creditor to effectuate the fresh start policy of the Bankruptcy Code.  Owens v. Miller (In

re Miller), 276 F.3d 424, 429 (8th Cir. 2002).  Accordingly, a creditor opposing discharge

of a debt carries the burden of proving the debt falls within an exception to discharge.

Werner v. Hofmann, 5 F.3d 1170, 1172 (8th Cir. 1993) (per curium).  Preponderance of the

evidence is the standard of proof that applies to discharge exceptions under 11 U.S.C. §

15

523(a). <u>Grogan v. Garner</u>, 498 U.S. 279, 286-87 (1991); <u>Simek v. Erdman</u> (<u>In re Erdman</u>), 236 B.R. 904, 911 (Bankr. D.N.D. 1999). Where an objecting creditor fails to establish every element under section 523(a), the indebtedness at issue is dischargeable. <u>In re Erdman</u>, 236 B.R. at 911.

Rapid Funding argues that the $200,000 loan to Gunkelman was obtained by false pretenses, false representation and actual fraud and should not be discharged under 11 U.S.C. § 523(a)(2)(A).

Section 523(a) of the Bankruptcy Code excepts certain debts from discharge in bankruptcy, including debts for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud. 11 U.S.C. § 523(a)(2)(A). To meet its burden of proving that Gunkelman is not entitled to a discharge of the debt owed to it, Rapid Funding must make a threshold showing that the debt was "obtained by" false pretenses, a false representation, or actual fraud. 11 U.S.C. § 523(a)(2)(A). If this threshold showing is made, Rapid Funding must then prove each of the following elements to establish nondischargeability of a debt under section 523(a)(2)(A):

1.    the debtor made a false representation;

2.    at the time the representation was made, the debtor knew it was false;

3.    the debtor made the representation deliberately and intentionally with the intention and purpose of deceiving the creditor at the time he made the representation;

4.    the creditor justifiably relied on the representation; and

5.    the creditor sustained the alleged loss as the proximate result of the representation.

16

Marcusen v. Glen (In re Glen), 427 B.R. 488, 492 (B.A.P. 8th Cir. 2010); Blue Skies, Inc.

v. Preece (In re Preece), 367 B.R. 647, 652 (B.A.P. 8th Cir. 2007); Burt v. Maurer (In re

Maurer), 256 B.R. 495, 500 (B.A.P. 8th Cir. 2000).

In determining whether Rapid Funding met its threshold showing, this Court must

decide whether section 523(a)(2)(A) requires Rapid Funding to show that Gunkelman

personally received the "money, property, or services" that was "obtained by" false

pretenses or false representation.  As summarized by the court in In re Reuter, three views

on this issue have been adopted by various courts.  Cutcliff v. Reuter (In re Reuter), 427

B.R. 727, 745 (Bankr. W.D. Mo. 2010), aff'd 443 B.R. 427 (B.A.P. 8th Cir. 2011), aff'd 686

F.3d 511 (8th Cir. 2012).

> The first view requires that the debtor personally receive the money obtained
> by fraud. The second view, characterized as the "receipt of benefits theory,"
> requires only that the debtor derive some benefit from the money obtained
> by fraud; the person or entity the money was obtained for is irrelevant.  The
> last view holds that a debt may not be discharged whenever the debtor
> fraudulently obtains money, regardless of whether it is for himself and
> whether the debtor derived any benefit.

Id. at 745 (citation omitted).  Most courts that have discussed the transfer of money,

property or services in the context of section 523(a)(2), including four circuit courts, applied

the second approach.[11]

---

[11] See e.g., HSSM #7 Ltd. P'ship v. Bilzerian (In re Bilzerian), 100 F.3d 886, 890
(11th Cir. 1996); BancBoston Mortg. Corp. v. Ledford (In re Ledford), 970 F.2d 1556,
1561-62 (6th Cir. 1992), cert. denied, 507 U.S. 916 (1993); Luce v. First Equip. Leasing
Corp. (In re Luce), 960 F.2d 1277, 1283 (5th Cir. 1992); Ashley v. Church (In re Ashley),
903 F.2d 599, 604 (9th Cir. 1990); In re Reuter, 427 B.R. at 745; Mosiman v. Warren (In
re Warren), 2010 WL 2640267, at *2 n.3 (Bankr. N.D. Tex. June 29, 2010); Steiert v.
Schroeder (In re Schroeder), 2006 WL 4452975, at *12 (Bankr. D.N.J. Mar. 31, 2006);
CM P'ship v. Groover (In re Groover), 2004 WL 212948, at *5 (Bankr. M.D.N.C. Jan. 16,
2004); Jacobs v. Mones (In re Mones), 169 B.R. 246, 251-53 (Bankr. D. Colo. 1994);
Century First Nat'l Bank of Pinellas Cnty. v. Holwerda (In re Holwerda), 29 B.R. 486,

It appears that the Eighth Circuit has not directly confronted the issue of whether section 523(a)(2) requires the claimant/creditor to show that a debtor must personally receive the "money, property, or services" that debtor "obtained by" false pretenses or false representation, but its ruling in In re Dallam is consistent with the "receipt of benefits" approach. See Lawyers Title Ins. Corp. v. Dallam (In re Dallam), 850 F.2d 446, 448-49 (8th Cir. 1988) (holding that debtor obtained payment of debts owed by her corporation (rather than personal debts) by knowingly making a false statement to induce a creditor to rely on it, and causing the creditor to lose money).  In a second, more recent case, the Eighth Circuit cited cases standing for the proposition that "obtaining" in the context of section 523(a)(2) has one meaning: "the direct transfer of money from a creditor to the debtor." See Marcusen v. Glen (In re Glen), 639 F.3d 530, 533 (8th Cir. 2011).  There appears to be no Eighth Circuit cases suggesting that it would adopt the third view:  a debt may not be discharged whenever the debtor fraudulently obtains money, regardless of whether it is for himself and whether the debtor derived any benefit.

Upon review of the issue, this Court agrees that the "receipt of benefits" approach is the better reasoned view.  The debtor need not personally receive or possess the money or property to fall within the meaning of section 523(a)(2)(A).  Rather, the debt is excepted from discharge if the objecting party shows that the debtor benefits in some way from the property obtained through his or her deception.  See id.

---

488-89 (Bankr. M.D. Fla. 1983); Bates v. Winfree (In re Winfree), 34 B.R. 879, 882-83 (Bankr. M.D. Tenn. 1983).

18

Therefore, the question becomes whether the "money, property or services" disbursed pursuant to the Note Gunkelman admits he voluntarily signed was "obtained by" Gunkelman, in that he received benefit from the loan proceeds.

The undisputed evidence received at trial shows that Regal was acting on behalf of Gunkelman (as Gunkelman suggests) or on behalf of both Gunkelman and Regal (as Rapid Funding suggests) with regard to  transactions related to the loan negotiations and the documentation supporting it.  The parties agree Regal and Gunkelman had known each other for many years and that Regal had maintained a business relationship with Gunkelman's father before he died, and had participated in several business ventures with Gunkelman.  It is also undisputed that Regal was the primary point of contact on the loan transaction and that he represented Gunkelman when discussing the terms of the Note and the collateral for the loan, including the sugar beet seed.  The parties even agree that Regal was authorized to relay wire instructions for the transfer of the loan.  According to Rugg, Regal represented that he and Gunkelman were business partners and Gunkelman never indicated otherwise.

Gunkelman conceded that Regal had authority to communicate with Rapid Funding on every aspect of the loan transaction except the disbursement of the funds to Huffe, but denied that he and Regal were partners.  Gunkelman contends that Huffe was an unintended recipient of the funds, that the funds should have been provided to him, and only him, and that he did not grant Regal authority to wire the funds to anyone but him. Since he did not receive the loan proceeds, Gunkelman claims that the Note lacked consideration and is, therefore, unenforceable.

19

Upon close review of the record, Rapid Funding's claim that Regal and Gunkelman

were partners is not supported by the greater weight of the evidence.[12]

---

[12] Under Oregon and North Dakota law, Rapid Funding must show that Gunkelman and Regal intended to establish a relationship to carry on a business for profit and that borrowing money from Rapid Funding was an act within the ordinary course of that partnership. Wirth v. Sierra Cascade, LLC, 230 P.3d 29, 40-41 (Or. Ct. App. 2010) (noting that Oregon courts look to a variety of factors in deciding whether a partnership exists, including expression of an intent to be partners, participation in the control of the business, contribution or agreement to contribute money or property to the business, and an agreement to share profits or losses, but it can be inferred that receiving a share of profits is the most important); Sandvick v. LaCrosse, 747 N.W.2d 519, 521 (N.D. 2008) ("The crucial elements of a partnership are (1) an intention to be partners, (2) co-ownership of the business, and (3) a profit motive.") (citation omitted); O.R.S. § 67.090; N.D.C.C. § 45-15-01.

Rapid Funding offered no partnership agreement, letters or other documents in support of its claim that Regal and Gunkelman were partners and that the loan transaction at issue was negotiated and consummated in the ordinary course of that partnership. To the contrary, the name of the partnership or partnership business was not on the Note, and Rapid Funding did not insist that Regal sign as a co-maker, suggesting that the loan was made only to Gunkelman, not Gunkelman and Regal. Rapid Funding's claim that Regal was not required to sign the Note because he did not provide collateral would make sense if the parties were asked to sign a security agreement or mortgage, but its willingness to overlook Regal as a co-maker on the Note for the reason suggested lacks credibility.

The evidence on which Rapid Funding primarily relied to support its claim that Gunkelman and Regal were partners was the fact that Regal was the point of contact on the loan and Gunkelman allowed him to take charge. As described in more detail below, the course of conduct on which Rapid Funding relied to determine that Regal was a partner authorized to direct disbursement of the loan proceeds was a few telephone conversations over the course of only six days, interrupted by the Christmas holiday. Rugg testified that Regal referred to Gunkelman as a partner in these conversations, but there was no testimony about the mechanics of the partnership (name, share, control, contributions, profit share, limited or general) or the purpose or business of the partnership or any other information that would lend credibility to this hearsay statement from the CEO of Rapid Funding. Consequently, this evidence, by itself, is not sufficient to establish a partnership.

In support of its claim that Regal and Gunkelman were partners, Rapid Funding also asserts that Gunkelman and Regal knew each other for a long time, had been involved in joint business ventures in the past and were partners in C, G & R Enterprises formed to purchase a sugar beet plant in Texas in 2004. Conversely, Gunkelman testified that the C, G & R Enterprises' partnership ended when the transaction to purchase the plant fell through and that Regal and Gunkelman were not

20

Whether Regal was Gunkelman's agent vested with apparent authority to direct Rapid Funding to forward the loan proceeds to Huffe is a much closer call.  While common sense suggests that the person who signed the $200,000 Note and offered all the collateral securing the Note would expect to receive the funds (or at the very least be consulted about disbursement), there is no evidence that Rapid Funding confirmed the wire transfer directions with Gunkelman before it disbursed the funds.  Rather, Rapid Funding assumed that Regal was acting on behalf of Gunkelman when Regal arranged for the transfer of funds to Huffe because Regal acted on behalf of Gunkelman with regard to all other aspects of the loan transaction.  Rapid Funding based this assumption on only a few conversations between Rugg and Regal and/or Gunkelman over the course of only 6 days, interrupted by the Christmas holiday.[13]  Rugg did not know either Gunkelman or Regal before the loan transaction at issue.

---

partners in any business at the time Rapid Funding made a loan to Gunkelman.

Without documents or testimony showing Regal and Gunkelman were involved in an active or on-going business for profit or testimony from Regal regarding his intent to form a business relationship with Gunkelman where the two would share profits and losses or any evidence that Gunkelman and Regal were co-owners of a business together, the Court is left with hearsay testimony from Rugg and evidence that Gunkelman and Regal participated in unrelated business ventures at some point prior to the loan transactions.  Given Gunkelman's denials and the lack of credible information about the purpose of the loan or the business of the alleged partnership, there is simply not sufficient evidence to find, by a preponderance of the evidence, that Regal was acting as Gunkelman's partner in directing the transmission of the loan proceeds.

[13] The initial contact with Rapid Funding was on December 22, 2006 and the funds were disbursed on December 28, 2006.

On the other hand, Gunkelman offered no evidence that he advised Rugg of his expectations that the loan proceeds be transferred directly to Gunkelman but, instead, allowed Regal to handle the fund transfer.

The issue comes down to the credibility.  Is Rugg's self-serving testimony about Regal's representations regarding his relationship and partnership more credible than Gunkelman's self-serving testimony about the fact that he did not authorize Regal to direct Rapid Funding to transfer the loan proceeds to Huffe?  Given all the evidence, the Court does not find either party's testimony more persuasive.  Since Rapid Funding carries the burden of proof on the question of apparent authority, the Court finds that Rapid Funding has not shown that Regal had apparent authority to authorize Rapid Funding to transmit the loan proceeds to Huffe.

However, even if the Court had found that Regal had apparent authority to direct Rapid Funding to transfer the loan proceeds to Huffe, this finding would not resolve the critical question: Did Gunkelman benefit from the loan proceeds?  The record is completely devoid of an answer to this question.  It is possible that the funds were used to finance a joint venture between Gunkelman, Regal and a third party.  On cross examination, Rugg testified that there was some mention of African oil futures, but it is apparent from the context of the testimony that Rugg did not know whether the loan proceeds were spent on such a venture.  It is also possible that Regal used the money for his own business or investments, with or without Gunkelman's consent (although there is an absence of evidence that Regal actually received the funds reportedly transferred to an account in his

22

name[14]).  It is also plausible that Huffe absconded with the funds, as Gunkelman suggested in closing argument.  The Court reaches only one conclusion: all of these theories are speculative.

The fact that Gunkelman did not (1) ask Regal about Huffe after he learned the loan proceeds were disbursed to her, or (2) complain to Rapid Funding about not receiving the proceeds, or (3) dispute that he owed a debt to Rapid Funding from mid-2007 to January 2010, simply adds to the mystery.  It is plausible that Gunkelman did not complain about Huffe and dispute the debt because the funds were used for an investment opportunity from which he expected to benefit.  However, it is also plausible that Regal received the money and Regal promised to pay the debt for Gunkelman.  It is possible that Huffe absconded with the money, and he thought Rapid Funding would pursue her.  Again, this Court is left to speculate, and it may not rely on speculation.

It is apparent that the parties made a purposeful decision not to call Regal or Huffe as witnesses at trial and to leave the Court without evidence of how the loan proceeds were spent, a decision this Court respects.  However, Rapid Funding–as the plaintiff and party objecting to discharge--bears the burden of proof and the risk for such a decision.  Without any underline evidence supporting the proposition that Gunkelman benefitted from the loan proceeds, this Court may not conclude that Gunkelman "obtained" the loan proceeds within the meaning of section 523(a)(2)(A).  Rapid Funding failed to meet its burden of proving this threshold requirement.  Its claim and cause of action under section 523(a)(2)(A) is dismissed.

---

[14] See Def.'s Exh. 50 (emails between Huffe and Rugg).

23

C.   11 U.S.C. § 727(a)(5)

In its Amended Complaint and at trial, Rapid Funding alleged that Gunkelman's discharge should be denied under 11 U.S.C. § 727(a)(5) because he failed to satisfactorily explain the disposition of the $200,000 in loan proceeds.

Denying a debtor a discharge is a harsh remedy. Allred v. Vilhauer (In re Vilhauer), 458 B.R. 511, 514 (B.A.P. 8th Cir. 2011). Accordingly, section 727 is strictly construed in favor of the debtor. Id. Notwithstanding, a discharge in bankruptcy and the associated fresh start are privileges, not rights. Bauer v. Iannacone (In re Bauer), 298 B.R. 353, 357 (B.A.P. 8th Cir. 2003) (citing Grogan v. Garner, 498 U.S. 279, 286 (1991)). "The opportunity for a completely unencumbered new beginning is limited to the honest but unfortunate debtor." Id. The cost to the debtor for an unencumbered fresh start is minimal, but it includes honestly and accurately disclosing his or her financial affairs and cooperating with the trustee. Id.; see also 11 U.S.C. § 521 (listing a debtor's duties in bankruptcy).

Section 727(a)(5) provides for denial of discharge when "the debtor has failed to explain satisfactorily . . . any loss of assets or deficiency of assets to meet the debtor's liabilities." 11 U.S.C. § 727(a)(5). The party seeking denial of discharge has the burden of proving that debtor owned substantial and identifiable assets and a loss or reduction of assets actually occurred. Floret, L.L.C. v. Sendecky (In re Sendecky), 283 B.R. 760, 765 (B.A.P. 8th Cir. 2002); United States Trustee v. Kouangvan (In re Kouangvan), 2012 WL 2931182, at *5 (Bankr. S.D. Iowa July 18, 2012); Riley v. Riley (In re Riley), 305 B.R. 873, 885 (Bankr. W.D. Mo. 2004). If the objecting party demonstrates a deficiency of assets, it is incumbent upon the debtor to provide a satisfactory explanation for the loss of the assets. In re Riley, 305 B.R. at 885; In re Vilhauer, 458 B.R. at 514.

24

Whether a debtor's explanation is "satisfactory" is left to the discretion of the court. In re Riley, 305 B.R. at 885. "If the explanation is too vague, indefinite, or unsatisfactory then the debtor is not entitled to a discharge. The explanation given by the debtor must be definite enough to convince the trial judge that assets are not missing." In re Sendecky, 283 B.R. at 766 (internal citations omitted). "The debtor need only provide an explanation of the loss of the assets; it need not necessarily be meritorious." In re Riley, 305 B.R. at 885 (citations omitted). Although section 727(a)(5) has no limitations period, courts generally find that the debtor must have owned the assets "at a time not remote in time to case commencement." Mungenast v. Darr (In re Darr), 472 B.R. 888, 900 (Bankr. E.D. Mo. 2012); Cohen v. Olbur (In re Olbur), 314 B.R. 732, 741 (Bankr. N.D. Ill. 2004) (internal citations omitted). How remote in time is too remote in time depends on the facts of the case. Id.

Rapid Funding argues that Gunkelman offered no credible explanation regarding the disappearance or disposition of the $200,000 in loan proceeds it disbursed. The explanation Gunkelman offered was that he did not receive the loan proceeds.

The evidence received at trial establishes that Rapid Funding wired the loan proceeds to Huffe for an account referred to as a transactional account for Regal. See Def.'s Exh. 50. The Court received no evidence regarding the disposition of the proceeds following the transfer to Huffe. As noted above, Rapid Funding offered no proof that Gunkelman received the loan proceeds or benefitted from them. Accordingly, Rapid Funding did not meet it burden of proving that Gunkelman owned the substantial and identifiable asset on which its section 727(a)(5) claim is based. See In re Darr, 472 B.R. at 901 (finding that the dissipation of certain sale proceeds could not be the basis of a

25

section 727(a)(5) objection because the objecting party failed to show that the sale proceeds were prepetition property of the debtor); In re Kouangvan, 2012 WL 2931182, at *5 ("Once a creditor has established that debtor owned substantial and identifiable assets, a debtor must satisfactorily explain loss of such assets.") (citation omitted).

Accordingly, the Court finds that Rapid Funding did not meet its burden of proving the elements of section 727(a)(5).  This claim and cause of action is dismissed.

### D.     28 U.S.C. § 2201

In its first claim for relief, Rapid Funding alleges that it is entitled to a declaration that it has an existing, valid claim against Gunkelman based on the terms of the Note.  Debtors did not file an objection to Rapid Funding's proof of claim but, in Schedule F, they list its claim as contingent, unliquidated and disputed.  Debtors oppose Rapid Funding's claim for relief asserting that the Note on which it is based lacked consideration.

In support of its argument that it is entitled to a declaration that its claim is enforceable, Rapid Funding asserts that failure of consideration is not a defense to common law fraud.   It claims that it need only prove the following elements of common law fraud:

> (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted on by the person; (6) the hearer's ignorance of its falsity; (7) his reliance on its truth; (8) his right to rely thereon; and (9) his consequent and proximate injury.

Pl.'s Trial Memo. at 7 (citing Webb v. Clark, 546 P.2d 1078, 1079 (Or. 1976)); see also Merten v. Portland Gen. Elec. Co., 228 P.3d 623, 629 (Or. Ct. App. 2010) (citation omitted).

26

Rapid Funding cites no legal authority for the proposition that failure of consideration is not a defense to fraud. Assuming for the purpose of argument that it is correct, the Court will consider the elements to its common law fraud claim.

To meet is burden of proving reliance on a false representation under Oregon law,[15] Rapid Funding must show that its reliance was reasonable. Murphy v. Allstate Ins. Co., 2012 WL 3055565, at *4-5 (Or. Ct. App. July 25, 2012). Courts consider the totality of circumstances in deciding whether a party reasonably relied on fraudulent representations. Id.

> The requirement that a plaintiff's reliance be justified serves as a balance between, on the one hand, the policy that a person who intentionally deceives another should not be allowed to profit from the deception and, on the other hand, the recognition that the person deceived, as an autonomous individual, should be responsible for protecting his or her own interests when making a decision. Consequently, to satisfy the element, a plaintiff must have exercised reasonable diligence, in the totality of the circumstances, to assess the truth of the allegedly fraudulent statements before acting in reliance on them. Put another way, the determination whether a person's reliance on a fraudulent statement was justified typically hinges on the extent to which the plaintiff had a duty to investigate the truth of the statement.

Id. at *4 (citations omitted). Oregon courts focus on two circumstances in deciding whether a plaintiff has a duty to investigate the truth of the statement: (1) the ability of the plaintiff to obtain information that would reveal the truth and (2) the relative sophistication of the parties. Id. at *5.

Rapid Funding is in the business of loaning money and its employees understood the importance of securing collateral. Rugg worked in the short-loan making business since at least 2001. He testified that Rapid Funding made approximately 25 loans per year.

---

[15] Rapid Funding asserts that the enforceability of the Note is governed by Oregon law pursuant to the terms of the Note.

27

Despite its experience with lending, the record reflects Rapid Funding's complete lack of due diligence. From beginning to end, the loan negotiation took six days, interrupted by a holiday. Rugg was contacted by telephone on Friday, December 22, 2006, and the loan was disbursed on Thursday, December 28, 2006. He admitted that he had never met Regal or Gunkelman before their telephone conversations.

Rugg testified Rapid Funding requested substantial collateral, typically in the form of real estate, before lending money. When Rugg learned that Regal did not have real property to pledge and the real property Gunkelman offered was secured by a first lien, Rugg demanded more security. Gunkelman offered the sugar beet seed as security, but the seed is not referenced in the Note. Rapid Funding did not request or secure a UCC security interest or a financing statement for the sugar beet seed. In fact, Rugg testified that he was not familiar with these documents. Consequently, Rapid Funding offers no documentary evidence in support of their claim that the sugar beet seed served as collateral for the loan to Gunkelman.

In a letter printed on Dakota Quality Seed letterhead, Gunkelman represented that he possessed 229,280 pounds of sugar beet seed that had been in storage for only 11 months and that the current value of the seed was $8,135,880.00. After receiving the letter, Rapid Funding performed a minuscule amount of further investigation into the value of the sugar beet seed, only searching the internet for current values and finding a broad range: $3/lb to $80/lb. Despite this extreme range in the value of seed and the exceptionally high value estimate from Gunkelman, Rapid Funding took no further steps to verify the quantity or quality of sugar beet seed offered as collateral by Gunkelman. It did not perform an onsite inspection of the sugar beet seed; it did not request a sample of

28

the seed for testing or conduct any other form of professional evaluation of germination quality. Requesting either would have revealed that Gunkelman's representations were false.

Further, there is no evidence that Rapid Funding followed up on Gunkelman's qualifications to provide such an estimate. If it had inquired with or about Dakota Quality Seed, it would have learned that the company stopped doing business. If it had inquired about Gunkelman's qualifications, it would have learned that he had no expertise in sugar beet seed, as he testified at trial.

The Court is also troubled by the apparent defects in the Note. A notary public did not witness Gunkelman's signature, although the signature page appears to require a notary public to witness the signature. Regal is listed as a maker on the Note, but he did not sign the Note. Gunkelman testified that he did not sign a written document acknowledging his consent for Regal to be excepted as a maker as required by the Note.

Upon examination of the entire record, the Court is left with the impression that Rapid Funding sought to accommodate an urgent request for funds and expedited the loan-making process. In doing so, it took short-cuts and now must assume the risk of such decisions. While the record is replete with evidence supporting Rapid Funding's claim that Gunkelman knowingly made false representations with regard to the sugar beet seed he offered as collateral–which this Court does not condone–Rapid Funding must prove all the elements of the common law fraud claim on which it relies in its request for declaratory relief. Reliance is one of these elements. It has failed to meet this burden. Accordingly, Rapid Funding's common law fraud claim does not serve as a basis for its request for declaratory relief.

29

Absent proof of common law fraud, this Court must consider whether the Note Gunkelman signed is enforceable. For the reasons set forth in detail above, the Court finds that there is no evidence that Gunkelman received the loan proceeds or benefitted from them. Therefore, Rapid Funding's Note is unenforceable due to lack of consideration. Its request for declaratory relief is denied.

### E.    Specific performance

For the reasons stated above, Rapid Funding did not meet its burden of showing that the Note is valid and enforceable. Its request that the Court order Debtors to execute a new deed of trust to the Fargo Property, which it claims serves as security for the Note, is denied. This claim and cause of action is dismissed.

The Court has considered all other arguments and deems them without merit.

## III.    Conclusion

For the reasons provided above, Rapid Funding's claims and causes of action under 11 U.S.C. § 523(a)(2)(A) and 11 U.S.C. § 727(a)(5) are DISMISSED. Rapid Funding's request for declaratory relief concerning the validity of Rapid Funding's claim against Debtors and its interest in Debtors' real property is DENIED. This cause of action is DISMISSED. Since its request for specific performance was based on the validity of its claim, this cause of action is also DISMISSED.

Judgment may be entered accordingly.

Dated this 11th day of September, 2012.

      /s/    SHON HASTINGS
Shon Hastings, Judge
United States Bankruptcy Court